18-6142 Good morning. May it please the Court, my name is Mary Katherine Nagel and I serve as counsel to the Caddo Nation of Oklahoma. The Caddo Nation's requests for injunctive relief to halt the construction of the History Center are moot. But nothing under federal or constitutional law requires the Caddo Nation to wait to raise its current claims for ongoing violations of the Administrative Procedures Act, the National Environmental Protection Act, and the National Historic Preservation Act for ongoing violations related to the current operations of the History Center, as well as the Wichita Tribe's planned additional construction at the very same site. Plans that they outlined in their environmental assessment back in 2015, the environmental assessment from which grow forth the Caddo Nation's claims that this environmental assessment violates the National Historic Preservation Act and the National Environmental Protection Act. Maybe you can just start with, help us understand what the effect of the building being built has on your case. Sure. So, under this Court's precedent, for instance, under Airport Neighbors, the construction, you know, when you're bringing in a need for a challenge, the construction of the project could render the claim moot. However, it's not moot if there are still a remedy that the Court can provide related to the ongoing operations. Here, certainly harm was done. The construction of the History Center, since we know this site is a historic site, it's the original site of the Riverside Indian Boarding School, Caddo elders have told us, and this is in the record, that there were three tribes whose children attended this school, the Delaware Nation, the Wichita Tribes, and the Caddo Nation. Caddo elders say, and this is common at many boarding schools in this era of United States history, that when children passed away while in attendance at the school, they were buried there. The Caddo Nation was never permitted to undertake the specific testing it had requested numerous times, and that the Wichita Tribe, in January 2016, had told the Caddo Nation it would undertake before commencing construction later in May 2016. So, the construction of the History Center does preclude the testing on that literal piece of ground on the entire site of the original Riverside Indian Boarding School. We cannot now test there. However, because there are plans for additional construction of the site, our claim is that there's ongoing harm until or unless we have one or six consultations under NHPA, and we can actually undertake that GPR testing that we've been requesting ever since we started engaging in this dialogue several months before the Wichita Tribe commenced construction. And that GPR testing that Caddo Nation keeps on requesting was specifically promised to my client in January 2016 in a letter that the Wichita Tribe's president, Terry Parton, wrote to the Caddo Nation stating that their own expert, John Northcutt, an archaeologist, in April 2015, had done a study at this site as a part of the procedure that the tribe had to undertake in completing the environmental assessment, and that archaeologist, the tribe's archaeologist, said this is the site of the original Riverside Indian Boarding School. Further research may make this site eligible for the National Registry of Historic Places, and I'd recommend further research. That was all told to our client in a January 2016 letter. Our client came back in February 2016 and said, we want to do this GPR testing that you've said you will do. We are concerned that there are Caddo children buried here, and we think this is very important. We want to engage in consultation. And the Wichita Tribe refused, and they've been refusing ever since. So when this case came up, and again, when this case came up before in late 2017, the issue was we were appealing the denial of a motion for preliminary injunction. And so the whole discussion was around whether or not, what kind of remedy could the Tenth Circuit fashion when the History Center has now been constructed. And at that time, the Tenth Circuit decided that our claims for injunctive relief to halt the construction of the History Center were moot. However, the Tenth Circuit said that that is not to say, and I quote, that is not to say Caddo Nation does not have new claims for relief. It can seek in the district court regarding the operation of the center or other activities on the site. And after reading that, you filed the first amendment complaint. Correct. So that's what we want to focus on. Exactly. And in that complaint, we do claim, we do ask for remedies to, in the form of injunctive relief, to halt the ongoing operations until 106 consultation can take place. And until the testing, this GPR testing that we've referred to numerous times in our pleadings and in our briefs can be undertaken. And, you know, we refer to the... Okay, so could you just clarify? I heard you say ongoing operations, but I also, I think, heard you say additional construction. And let me just ask you about that. In the environmental assessment, there's reference to not just the center, but to construct a traditional grass house, grass arbor, and a ceremonial dance ground. Is that what you're talking about? Yes, Your Honor. And in fact, in that same environmental assessment, the Wichita tribe stated that it was, you know, taking on these HUD funds and performing this environmental assessment as required under NEPA for the history center. All right. But let me just ask, is that what gets you past mootness? Yes. In addition to that statement as well... Well, let's just stick with those projects. Sure. I know you've got some other things you want to talk about. But is anything in regard to those projects pending or imminent at this time? Not that we're aware of. All that we know of is that the Wichita tribe put it in its environmental assessment saying that we're getting these funds to do the history center in addition to these projects at the same site. The environmental assessment was in place before you asked for a plenary injunction, you came up here in the first place. That's always been there. Exactly. But you were only challenging the construction of the center at that point. In our initial complaint, before the admitted complaint. All right. And then the Tenth Circuit told us in its decision in December of 2017, you know, the requests for injunctive relief for the construction of the history center are moot. But new claims related to ongoing operations or additional construction or other activities at the site... Okay, we're talking about additional construction. And I guess my question is, if the additional construction projects that were listed in the environmental assessment have been abandoned for some reason, would the case be moot then? Our argument is no, for two reasons, Your Honor. First, it's in the environmental assessment, which forms the basis for our challenge under NEPA and under the NHPA. And second of all, their attorney told this court just a little bit over a year ago when the court said, counsel, do you have additional plans for construction at this site? And the attorney for the tribe said, yes, we do. So... Well, but what if now they don't? Well, we would... At some point, doesn't this become moot if it's just the center? Mm-hmm. Well, you know, I think we... Our position is that I'm not sure how certain we are of that under the current scrutiny that this court would have, because right now we have... What we have before us are statements in their environmental assessment, statements their counsel has made before this court. We've put those statements into our admitted complaint. We would assert that at this stage of review, before we've had any kind of factual inquiry, those statements, plausible enough, are to be taken as true. Now, if they have evidence that subsequent to their, you know, our argument here before this court a little over a year ago or the environmental assessment, they've changed their mind, we think that's more right for factual inquiry. Instead, what we think they're asking... Challenging... Making challenges to whether there's been need for compliance. Aren't we limited to the plans that are set forth in the environmental assessment board? Aren't you limited to those plans? Well, absolutely, and that's our argument here. Then let me just ask you, though, because it seems as if in your brief there's discussion of references to potential buildings that were mentioned in press releases or in the cultural resource inventory, but shouldn't those fall outside? Don't those fall outside the environmental assessment? I agree with Your Honor, and we offer those statements simply to respond to the district court's dismissal of our complaint on the grounds that what was in the EA is mere speculation. The district court said that our case is moot. All right. All I'm trying to do is understand whether the scope of our review concerns only what was set forth in the environmental assessment, insofar, for example, of deciding whether your case is moot. Certainly. We would posit that it's the environmental assessment as well as the John Northcutt study, since that was incorporated into the environmental assessment. Excuse me, I didn't hear the last part. The John Northcutt study, that's the archaeologist they hired to do that review that they relied upon and incorporated into their environmental assessment. He's the individual whose statements they relied upon. You can find it in the appellate appendix at pagination 0581, and he lists what the tribe told him when they hired him to undertake this study. The additional plans for construction at the site would include an office space, restaurant, hotel, casino, museum, dance grounds, grass hut exhibit, outdoor concert, and amphitheater and parking areas. So that is, as far as we're concerned, the grounds from which our NEPA and NHPA claims rest, because that is what they put forward as the basis. So that is much more than what was in the EA? Certainly, and I understand... I'm focusing on the EA. The EA was before this court when it said the matter was moved. Yes, and... So doesn't that mean that everything that's in the EA, grass hut, the dance area, etc., it's the law of the case, is that that does not make this active rather than move? Well, the district court, in its decision to dismiss our amended complaint, made no mention of these additional plans for construction identified in the EA. The Tenth Circuit... But isn't it... I don't know if I have the right expression. Is it to raise due to God or law of the case? If the Tenth Circuit had the EA before it and it said your case is moved, then anything in the EA does not make it active. Well, and I think what the Tenth Circuit was saying in December of 2017 is that... We never know. Sure enough. I would argue that what your esteemed colleagues were saying was that our request at that time, the denial of the motion for preliminary injunction, our request for injunctive relief was moved as to the construction of the History Center. But because the EA comprised more than just development of a History Center, including these other items, if we had claims as to the planned construction for those sites, then our claims about the fault... You know, the fact that they didn't consider alternatives in the EIS, the fact that they didn't adequately publish the finding of no significant impact. These... The merits of our underlying claims would not be moved because the entirety of their action as... Their planned actions in the environmental assessment had not yet come fully to fruition or been completed. So what agency action are you challenging specifically under the APA? The finding of no significant impact, the decision to not undertake an environmental impact study and to not consult with the Cato Nation, as well as to not properly publish the finding of no significant impact. Those are the actual agency actions. And of course, in this instance, the Wichita tribe, through its declaration in the EA, took on the head... You know, the agency's responsibilities and became the responsible entity. Did you, as to these other projects besides the Center, make any claims before the agency as to those projects? In other words, have you exhausted your challenge? Well, we're in a situation here with the... You know, the agency HUD completely detaches itself once the tribe or the local government or participant takes on that role of a responsible entity. So there is no recourse before HUD. We, of course, have written... You know, before litigation, wrote numerous letters and attempted numerous meetings with the Wichita tribe and, you know, made clear our demands that GPR testing be done. Are you saying, effectively, there are no administrative proceedings because HUD is out? Right. I don't know of any... I mean, my understanding of the law and the regulations is that there's no recourse to be taken with HUD. Your issue is simply with the local entity, the responsible entity that has taken on those duties. And we did take this... The tribe? The tribe, correct. And if there are no further questions... Why doesn't the tribe have sovereign immunity? The specific... The Wichita tribe. They specifically waived it here. And this is common when a tribe is taking on this role from a federal agency and becoming the, quote, responsible entity under the regulations. Well, how did they waive it? President Terry Parton, acting on behalf of the tribe, specifically wrote, and you can see this in the environmental... How do we know he was acting on behalf of the tribe? Well, she's the... Well, I think that's certainly their argument now. Of course, they didn't... Well, what's your argument? Our argument is that when, you know, the elected leader who accepted the funds on behalf of the entire tribe signed a statement, I consent to appear, I consent to jurisdiction in a federal district court for any claims arising out of this, you know, environmental impact statement, excuse me, environmental assessment, claims related to the environmental review, that that there waived sovereign immunity. And that, of course, was what the district court found, is what other courts have found when looking at similar situations. With that, I'll reserve the remaining few seconds for a minute of rebuttal. Thank you. Thank you. Thank you, Your Honors. My name is William Norman. My colleague, Michael McMahon, is with me today. We're representatives of the Pali, Wichita, and affiliated tribes. May it please the court. As has already been discussed here briefly, the issue remains for this case, mootness. This court previously concluded that the effort to enjoin construction at the History Center was moot. As my counterpart here has identified, the attempt to overcome mootness is based specifically on what is contained in the environmental assessment that was provided by Wichita and affiliated tribes. A point of clarification here factually, and I think you can find this in the record of appellate's appendix, there are some pictures at pages 716 through 718, which actually show the footing of the History Center being poured at the time that this initial dispute arose. In the background, you can see the grass hut and arbor being constructed. Those were part of the construction that was taking place with the History Center at the time. Those projects have been completed. And the dance area, too? The dance area has not been completed. The dance area was abandoned, and it was abandoned because the tribe chose voluntarily to move the location of the History Center to make it further away from the site of interest that our expert, Mr. Northcutt, identified as a potential site that potentially may be eligible. What in the record expresses an unequivocal abandonment of the dance area? I don't believe that there is an unequivocal abandonment of the dance area in the record itself, but on the ground, there is no dance area. There's no room for a dance area. Did the district court know that the dance area had been abandoned? You got in your brief, but we're reviewing what the district court decided. Did the district court know about that? The district court was aware of that. We were operating under the sound facts then. The amended complaint was filed. You moved to dismiss. It was a challenge to the amended complaint. In your brief, there's a photo. Was that photo before the district court, the one that's in your brief? Yes, Your Honor. Where is it in the record? Is it in the record? I believe it is, Your Honor. At the time that we were before the district court, we were operating under the same facts that we had when this court determined that the case was moved, and that was the history center was complete, as were the buildings connected to it, which were the arbor and the grass house. As a matter of fact, I believe the grass house and the arbor were completed prior to the completion of the history center. That was the project that was identified in the EA, and that was the project that was completed. The pictures you mentioned, though, on pages 716 to 718, those pictures were before the district court, correct? They were, and they were before this court previously. Are we down to the dance ground? We are down to the dance ground, which does not exist and does not intend to be. There's no plan for it at this time because of the relocation of the history center. But, Mr. Norton, you can see what we're searching for. We work with a record, and we have to have something in our record that indicates that that was abandoned unequivocally, and we don't know where to find it. If it's not there, as far as we know, it's not abandoned. I appreciate that, and I regret that I can't point you specifically to our underlying pleadings which make that clear. I can only reiterate that at the time that we argued this previously in the Tenth Circuit and the history center was complete, the other items were complete as well, and at that point the tribe had determined that they were not going to proceed with the dance ground. And that really gets into the question of sort of the speculation associated with these other projects that were mentioned in Mr. Northcutt's presentation and his additional study. He basically interviewed some folks on the ground and got a sense of what may happen in the future with respect to this 20-acre parcel and summarized that. Is there anything that can be attributed to statements to anyone that can bind the tribe? No, and I would fashion these as really closely akin to the 20-year master plan of Airport Neighbors where there were plans certainly for some other things to be done. None of those are interdependent on the establishment and building of the history center and the grass harbor and house, and so those were potential plans. And as the record is clear, Caddo Nation together with the Delaware Nation and with the knowledge and understanding and support of the Bureau of Indian Affairs surveyed these 20 acres in addition to another 51 acres associated and contiguous with them for the purpose of Wichita and Affiliated Tribes having the sole exclusive governmental authority and jurisdiction. And that's just one indication of over a century record of how the tribes in the area, the Wichita tribes in particular whose homeland this is, this is their aboriginal land, not Caddo's aboriginal land, not Delaware's aboriginal land, of how they have viewed and dealt with and addressed the particular property in question. So these statements and allegations to sort of shock the conscience about the potential for burials of deceased children just belies the record itself that all three of the tribes have approved over a lengthy period of time together with the Bureau regular agricultural leases on that property. The tribes themselves specifically gave exclusive governmental jurisdiction over the parcel to the Wichita and Affiliated Tribes and it's just clear that they have not acted consistent with the idea that these are sacred or that there were any graves associated with them. If you look at the contemporaneous record of the United States there are governmental surveys which actually call into question whether or not this was the location of the Riverside Indian School or whether it perhaps housed an agent's house. But we're not going there in this appeal are we? I mean don't we accept the proposition that, I guess you're talking about standing, they don't have standing because they had nothing at risk here? Well they bootstrapped the merits in on a number of places and I just wanted to make clear for the court because of the number of statements related to that, the nature of this and based on Affiliated Tribes. We have to accept what they say is true don't we? About this being a school under which maybe their children are buried or ancestors are buried. Yes. Counsel, before you move on, can I just understand your argument? Essentially, I think you're arguing that all claims in the environmental statement, those are moot, right? Yes. As far as we understand though, our reference in our opinion, earlier opinion, it also referred to operations and other activities. Are you suggesting there are no operations or other activities to be challenged at this point? When we reviewed that initial opinion, our impression was that that was just granting an opportunity for the Caddo Nation, if they could, establish through an amended complaint, some additional claim with respect to some operation or some other plans that would be sufficient for them to maintain standing and actually have a live case or controversy. We don't believe that the court was referring to some sort of specific known use or planning at the time and in fact we don't believe that that has been really addressed with respect to plaintiff's complaint below. What you see in the prayer for relief primarily is a request for an advisory opinion with respect to the allegation that Wichita-affiliated tribes violated NEPA and NHPA, despite the record reflecting even after the timeframe for consultation had ended, considerable discussion and sharing of information with the Caddo. But at the same time, what they ask in their prayer for relief associated with use has to do with the history center and what they're asking for is for the parties to have a conversation about whether or not relocation is appropriate. And as the district court below aptly noted, there's been lots of conversations. There's a building built with taxpayer funds and it's been appropriately operated and maintained and opened and there's really no allegation that anything associated with its operation is some violation of an environmental problem or creates other issues related to the National Historic Preservation Act. And you can see that from the Northcutt study, which makes clear that there is one site on the entire 20-acre area that has the potential to become a historic site, but only after further investigation were done and then only if there were significant additional items discovered. And as the record also notes, the Wichita-affiliated tribes asserted a barrier and then actually moved the original location of the history center to where it's approximately 500 feet away now from that one particular site. So they've taken great pains to avoid any potential problems associated with that. The idea that we would have a conversation about future relocation would actually be a discussion about whether we're going to tear the building down and move it somewhere else. And you can imagine the host of problems that creates both with respect to Wichita's effort initially and the funding and what funding would take place in order to relocate it, where would the relocation take place. It's just an impractical and implausible request for relief that's being asked here. Counsel, did the tribes executive committee approve the project? They did, Your Honor. Would that include acceptance of the HUD funds? It did. They did not. I would have to double check this, but I don't believe they included and expressed an unequivocal waiver of sovereign immunity in the resolution approving the site, but they did authorize the site. Don't you have to waive it to accept the funds? That's correct. Then are you still claiming sovereign immunity? We are claiming sovereign immunity with respect to the limit of our waiver of immunity was for a NEPA and NHPA and APA standard. And to the degree that we have gone beyond the Administrative Procedures Act currently, there is no waiver associated with that. And our suggestion to the court is that we are outside the bounds of the Administrative Procedures Act. Doesn't that just conflate with the merits of whether they've got a claim? If they don't have an APA, if there isn't a claim, isn't that the same thing? Well, I think you could find either way. The fact of the matter is that there's not a lot of controversy associated with the claim that they're making currently. It means that there is no jurisdiction for this court. At the same time, it means there can be no sustained effort under the APA. I don't know if this is – if the President of the tribe is signing the waiver, why isn't that a valid waiver? Well, we would argue that it's only a valid waiver with respect to a lawful proceeding. I understand. And just to be clear, to correct something here, the FONSI itself that was published advised that any objections to the FONSI were to be provided to HUD itself. And there was a time period to do that, a 30-day time period. There was no objection to the FONSI at the time, back in 2015, and nothing provided to HUD itself. And, of course, the Wichita tribe received nothing either. So, with that, we would urge the court to find that this case continues to be moved, that there's been no allegations in the amended complaint that would survive an analysis of that. And we'd ask you to uphold the decision of the district court to dismiss the case. Thank you. Okay. Very briefly, I appreciate Your Honor's reference to the prior panel's discussion of ongoing operations and a remedy tailored to that, and certainly that is in our amended complaint. So in addition to asking for remedy to a deal with the additional construction, I would urge you to look at paragraph 7 in our prayer for relief at the end of our amended complaint. There are other mentions of operations as continuing the harm, as well as our request of remedy. And also, I urge you to look at page 700 of the appellate appendix, where you will see a letter from President Partin of the Wichita tribe herself, where she states that this is, in fact, the site of the Riverside Indian Boarding School, and that they will undertake GPR testing, which has been the relief we've requested from day one, but they have still not undertaken it. So, with that, I'm out of time. Thank you so much. Thank you, counsel. Thank you, both sides, for your arguments this morning. The case will be submitted, and counsel are excused.